1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ANDREW A. CEJAS,

                                   Plaintiff,

v.

DANIEL PARAMO *et al.*,

                                   Defendants.

Case No.:  14-CV-1923-WQH(WVG)

**REPORT AND RECOMMENDATION RE: MOTION TO DISMISS BY DEFENDANTS PARAMO AND JAIME**

Pending before the Court is a motion filed by Defendants Paramo and Jaime to dismiss certain claims against them for failure to state a claim.  Despite the liberal pleading standards afforded to a *pro se* litigant, for the reasons set forth below the Court RECOMMENDS that Defendants' motion be GRANTED as to the specific claims disputed in their motion.

## I.    PROCEDURAL OVERVIEW

Plaintiff, proceeding *pro se*, filed a civil rights Complaint pursuant to 42 U.S.C. § 1983 on August 15, 2014.  (Doc. No. 1.)  When Defendants did not file an answer, Plaintiff filed a Motion for Default Judgment.  (Doc. No. 12.)  Defendant then filed a Motion to Dismiss for Failure to State a Claim on October 4, 2016 and a Response in

Opposition to Plaintiff's Motion for Default Judgment on October 5, 2016.  (Doc. Nos. 17, 19.)  Defendants only seek to dismiss Plaintiff's claims against Defendant Paramo and the retaliation claim against Defendant Jaime.  (Doc. No. 17.)  On November 25, 2016, Plaintiff filed an Opposition to the Motion to Dismiss.  (Doc. No. 24.)  Defendants did not file a reply in support of their Motion to Dismiss.  This Court then denied Plaintiff's Motion for Default Judgment on October 26, 2016.  (Doc. No. 20.)

## II.    FACTUAL ALLEGATIONS[1]

### A.    Claims Against Defendant Jaime

All events related to Plaintiff's Complaint transpired between September 2013 and April 2014 at the Richard J. Donovan Correctional Facility in San Diego, California, where Plaintiff is an inmate.  (*Id.* at 1, 8-9.)  Plaintiff's claims against Defendant Jaime spring from a dispute Plaintiff had with Defendant Rutledge.

Plaintiff claims that during the summer of 2013, Sergeant Rutledge conducted a search of Plaintiff's cell block.  (*Id.* at 12.)  While searching Plaintiff's cell, Rutledge saw Plaintiff's Buddhist altar cloth and ordered a subordinate officer to seize the altar cloth and deposit it on a heap of dirty laundry.  (*Id.*)  Defendant Rutledge reasoned that the altar cloth was a bed sheet that had been altered with swastikas, which was grounds for confiscation.  (*Id.* at 12-13.)  The altar cloth featured a Buddha sitting on a lotus in the middle; a peacock feather on the side; a snake known as Naga, the god of rain, on the other side; and swastikas in each corner.  Plaintiff asserts that swastikas are Buddhist symbols.  (*Id.* at 13-14.)

Plaintiff claims that he spoke to another sergeant, who approached the confiscating officer and explained that the cloth was a religious artifact.  (*Id.* at 12.)  That officer then returned Plaintiff's Buddhist altar cloth.  (*Id.* at 12.)  Plaintiff asserts that this was the

---

[1] The factual allegations herein are from Plaintiff's Complaint and are taken as true for purposes of the pending motion to dismiss only.

14-CV-1923-WQH(WVG)

second time that Defendant Rutledge had attempted to confiscate Plaintiff's altar cloth, commenting, "Sergeant S. Rutledge is a black officer, and has a prejudice and discrimination problem with the Buddhist Altar Cloth because it had Swastikas on all four corners." (*Id.* at 12-13.)

Plaintiff claims that on August 13, 2013, he approached Defendant Rutledge in the prison yard and presented him with a CDCR 22 Inmate Request for Interview form requesting an explanation for the confiscation of his Buddhist altar cloth. (*Id.* at 14.)  In the CDCR, Plaintiff explained that the altar cloth was light gray, whereas the facility's bed sheets were white, and provided brief descriptions of the altar cloth's symbols and meanings. (*Id.* at 13-14.)  Correctional officers in receipt of a CDCR 22 have an obligation to respond to it within three business days. (*Id.* at 75-76.)  When Plaintiff did not receive a response to his CDCR 22, on September 12, 2013, Plaintiff approached Defendant Rutledge and asked if he was going to respond. (*Id.* at 14.)  Rutledge said that he did not have to answer it, and when Plaintiff pressed him, Rutledge "took it personal [sic] as [if] plaintiff was telling him how to do his job.  Thereafter, Sergeant Rutledge threatened . . . to search [Plaintiff's] cell and threatened to take the hat [Plaintiff] was wearing." (*Id.* at 14.)  Rutledge subsequently ordered Officer Carter to confiscate Plaintiff's hat, which terminated the conversation. (*Id.* at 14.)

Before the end of yard release on September 12, 2013, Plaintiff attempted to access his cell but was told that officers were searching it. (*Id.*)  Defendant Rutledge had ordered Officer Jaime to search Plaintiff's cell. (*Id.*)  During the search, Jaime confiscated Plaintiff's headphones, the Buddhist altar cloth, and a baseball hat. (*Id.*)  Plaintiff claims that on his report, Jaime indicated that he had confiscated the Buddhist altar cloth because it was an altered handkerchief. (*Id.*)

Once the search had been completed, Plaintiff was summoned to the Program Office, where he found Defendants Rutledge and Jaime waiting with Lieutenant Allamby along

with all of Plaintiff's confiscated property. (*Id.* at 14-15.) Plaintiff attempted to explain to Lieutenant Allamby that he had asked Rutledge when he would receive a response to the CDCR 22, and that the Buddhist altar cloth was a religious artifact, not an altered handkerchief. (*Id.* at 15.) Lieutenant Allamby responded that the return of the altar cloth would be at Rutledge's discretion. (*Id.*) Plaintiff claims that he requested the return of his altar cloth, but Rutledge declined the request. (*Id.*)

On September 20, 2013, Plaintiff filed a Citizen Complaint against Defendant Rutledge for his failure to respond to the CDCR 22. (*Id.*) Plaintiff claims that he then submitted a CDCR 22 to Defendant Jaime on October 1, 2013, requesting the return of Plaintiff's Buddhist altar cloth. (*Id.* at 16.) Jaime did not respond to the CDCR 22, so on November 13, 2013, Plaintiff submitted a second CDCR 22 to him with the same request. (*Id.* at 17.) That CDCR 22 also went unanswered. (*Id.*) Plaintiff consequently filed a Citizen Complaint against Jaime for his repeated failure to respond to the CDCR 22 complaints. (*Id.*)

On February 7, 2014, Defendant Jaime finally responded to section B of the November 13, 2013, CDCR 22 that Plaintiff had filed against him, saying, "Title 15 CCR S. 3032(B) inmate shall not alter personal [sic] owned clothing. Your items were alter [sic] with the Swastika symbol." (*Id.* at 19.) Plaintiff claims that he responded to Defendant Jaime's answer by identifying the Buddhist altar cloth as permissible property under the Religious Property Matrix guidelines. (*Id.*)

Plaintiff alleges Defendant Jaime violated his First Amendment rights when Jaime searched Plaintiff's cell and confiscated a Buddhist altar cloth in retaliation for Plaintiff's request that Defendant Rutledge respond to the grievance Plaintiff had filed against Rutledge. (*Id.* at 27.) Plaintiff claims that the search and confiscation "represent[] a pattern of events demonstrating intentional retaliation against Plaintiff" and that the "confiscation of Plaintiff's Buddhist altar cloth imposed a substantial burden on his religious exercise"

4

because the "Buddhist altar cloth was used in Plaintiff's religious worship, and Plaintiff was unable to meaningfully practice his religion without the Buddhist altar cloth." (*Id.*)

**B.   Claims Against Defendant Paramo**

Plaintiff's claims against Defendant Paramo stem from his handling of Citizen Complaints Plaintiff filed against Appeals Coordinator Defendants R. Olson and J. Ramirez.

On December 30, 2013, Plaintiff filed a Citizen Complaint against Appeals Coordinators R. Olson and J. Ramirez for "impairing the filing of Citizen Complaints against Sergeant Rutledge that was submitted to the Appeals Coordinators months ago dated on September 20, 2013." (*Id.* at 18.)  Further, Plaintiff contends that Defendants Olson and Ramirez destroyed or lost the Citizen Complaints that Plaintiff had filed against Rutledge and Jaime. (*Id.* at 20.)  Plaintiff claims that Olson and Ramirez then screened out[2] the Complaint Plaintiff had filed against them. (*Id.* at 18.)  Plaintiff claims that he sent the Citizen Complaint back to the Appeals Coordinators, believing that the screen-out had been erroneous. (*Id.*)  On January 24, 2014, the Defendant Appeals Coordinators screened-out the Citizen Complaint again. (*Id.*)  Plaintiff then challenged the screen-out on January 27, 2014 but did not receive a response. (*Id.* at 19.)

On February 10, 2014, Plaintiff sent legal mail to Defendant Paramo and enclosed the two Citizen Complaints—one against each Defendant Appeals Coordinator. (*Id.* at 19-20.)  Paramo allegedly "did not answer, but read and sent the Citizen Complaints to the Appeal Coordinator Olson and Ramirez," who promptly screened-out the Citizen Complaints yet again. (*Id.* at 20.)  Plaintiff allegedly again challenged the screen-out, but did not receive a response. (*Id.*)

---

[2] This term essentially means "rejected."

5

Plaintiff claims that consequently, on March 5, 2014, he filed a Citizen Complaint against Defendant Paramo for having returned the Citizen Complaints about the Appeals Coordinators *to* the Appeals Coordinators themselves to screen out at their discretion.  (*Id.* at 21.)  Defendants Olson and Ramirez also screened out that Citizen Complaint.  (*Id.*)  Plaintiff alleges that "Appeals Coordinators have screened out . . . all Citizen Complaints filed by Plaintiff."  (*Id.*)  Plaintiff challenged that screen-out as well, but did not receive a response.  (*Id.*)

Plaintiff contends that Defendant Paramo violated his First and Fourteenth Amendment rights when Paramo "did not answer, but read and sent the Citizen Complaints [against Defendants Olson and Ramirez] to the Appeal Coordinator[s] Olson and Ramirez."  (*Id.* Doc. No. 1 at 20.)  Defendants Olson and Ramirez then in turn repeatedly "screen[ed] out the staff misconduct against themself [sic]," which is why Plaintiff had petitioned Defendant Paramo in the first place.  (*Id.* at 21.)  Plaintiff further alleges that Paramo violated his First and Fourteenth Amendment rights by "preventing Plaintiff from obtaining relief and from recovering his Buddhist pendant or Buddhist altar cloth because [P]aramo hired [A]ppeals [C]oordinator[s] R. Olson and J. Ramirez, [sic] Paramo is their boss."  (*Id.* at 28.)  Because Defendant Paramo is the warden, Plaintiff claims that, "[h]e is also policy maker for RJDP [Richard J. Donovan Prison], and establishes policies or written regulations that result in violations of constitutionally established civil rights."  (*Id.* at 9.)

## III.   LEGAL STANDARD

### A.   Rule 12(b)(6) Motion to Dismiss

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint.  *Id.*  Federal Rule of Civil Procedure 8(a)(2) requires only a "short and plain statement of the claim showing

6

that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In ruling on a motion under Rule 12(b)(6), the Court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them, and must construe the complaint in the light most favorable to the plaintiff. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) ("A complaint should not be dismissed unless a plaintiff could prove no set of facts in support of his claim that would entitle him to relief."). The Court should not consider whether the plaintiff ultimately will prevail. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), overruled on other grounds by *Davis v. Scherer*, 468 U.S. 183 (1984). Factual allegations, however, must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

**B.    Standards Applicable to *Pro Se* Litigants in Civil Rights Actions**

Where, as here, a plaintiff appears *in propria persona* in a civil rights suit, the Court also must be careful to construe the pleadings liberally and afford the plaintiff any benefit of the doubt. *See Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988), abrogated in part as stated in *Boarman v. County of Sacramento*, No. 2:11-cv-0285, 2013 WL 1326196, at *7 (E.D. Cal. Mar. 29, 2013); *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985). This rule of liberal construction is "particularly important in civil rights cases." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992). In construing a *pro se* civil rights complaint liberally, however, a court may not "supply essential elements of the claim that were not initially pleaded." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673

7

F.2d 266, 268 (9th Cir. 1982). "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." *Id.*; *see also Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir. 1977) ("Conclusionary allegations, unsupported by facts, [will be] rejected as insufficient to state a claim under the Civil Rights Act.") Thus, at a minimum, even the *pro se* plaintiff "must 'allege with at least some degree of particularity overt acts which defendants engaged in' that support [his] claim." *Jones v. Cmty. Redevelopment Agency*, 733 F.2d 646, 649 (9th Cir. 1984) (quoting *Powell v. Workmen's Comp. Bd.*, 327 F.2d 131, 137 (2d Cir. 1964)).

## IV. DISCUSSION

Accepting all material allegations in the Complaint as true and drawing all reasonable inferences therefrom, Plaintiff has not alleged facts sufficient to state a claim for relief that is plausible on its face with respect to Plaintiff's *respondeat superior* claim against Defendant Paramo and his retaliation claim against Defendant Jaime.

**A. Claims Against Defendant Jaime**[3]

Plaintiff alleges that Defendant Jaime violated his First Amendment rights by retaliating against him for speaking with prison officials and for pursuing internal grievances against Defendant Rutledge.

"Incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228 (2001). There is no statute or case law to suggest that prisoners do not have a right to speak to correctional officers. *See, e.g.*, *Clark v. Woodford*, 36 Fed. Appx. 240, 241 (9th Cir. 2002). In particular, "[p]risoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."

---

[3] Defendants assert that the Court "should dismiss Plaintiff's retaliation claims against Defendants Jaime and Strayhorn." (Doc. No. 17 at 4.) However, as Plaintiff notes in his Opposition, "Defendant Strayhorn was not added to the First Cause of Action for Retaliation." (Doc. No. 24 at 15.)

8

*Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)). Retaliation claims have five elements. *Id.*

First, a plaintiff must claim that "the retaliated-against conduct is protected." *Id.* Filing a grievance against a correctional officer or other individual within the prison's administration is protected conduct. *Id.*

Second, Plaintiff must allege that the "defendant took adverse action against the plaintiff," though "the adverse action need not be an independent constitutional violation." *Id.*

Third, the plaintiff must claim that a causal connection exists between the adverse action and the plaintiff's protected conduct. *Id.* In other words, "a plaintiff must show that his protected conduct was 'the "substantial" or "motivating" factor behind the defendant's conduct.'" *Brodheim*, 584 F.3d at 1271 (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)). Owing to the fact that a plaintiff rarely can produce direct evidence of a defendant's retaliatory intent, a plaintiff may plead circumstantial evidence that permits the inference of retaliation, such as the chronology of events. *See Watison*, 668 F.2d at 1114; *see also Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995).

Fourth, "the plaintiff must allege that the 'official's acts would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Watison*, 668 F.2d at 1114 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005)). An otherwise permitted action can be the basis for a retaliation claim if performed with a retaliatory motive and lacking a legitimate correctional goal. *See id.* at 1115. Even if a plaintiff fails to allege a chilling effect, he may still state a claim by alleging that he suffered some other "more than minimal" harm. *Id.*

Finally, the plaintiff must allege that the defendant's retaliatory conduct did not advance legitimate penological interests. *Id.* "A plaintiff successfully pleads this element by alleging, in addition to a retaliatory motive, that the defendant's actions were arbitrary

and capricious . . . or that they were 'unnecessary to the maintenance of order in the institution.'" *Id.* at 1114-15 (quoting *Franklin v. Murphy*, 745 F.2d 1221, 1230 (9th Cir. 1984)) (internal citations omitted).

In *Watison*, the plaintiff brought a § 1983 suit for the alleged retaliation against him for filing prison grievances. 668 F.3d at 1115. After the plaintiff filed a grievance against the defendant correctional officer for racial discrimination, the officer allegedly retaliated against the plaintiff by writing a false report claiming that the plaintiff had called her an expletive. *Id.* The plaintiff filed another grievance alleging retaliation and, consequently, the defendant correctional officer placed him in administrative segregation. *Id.* At the plaintiff's subsequent parole hearing, the defendant correctional officer testified that the plaintiff had been placed in administrative segregation for verbally abusing the staff, and the parole board denied the plaintiff parole. *Id.* The court held that the plaintiff had sufficiently alleged a claim of First Amendment retaliation for his filing of grievances against the defendant correctional officer. *Id.*

Here, Plaintiff alleges that he "suffered retaliation from Defendant Rutledge and Jaime when Plaintiff approached Rutledge to speak with him about a grievance to be answered. Plaintiff claims that "Defendant Rutledge threaten[ed] to search Plaintiff['s] cell in retaliation and carried out that threat." (Doc. No. 1 at 27.) Defendant Jaime is the officer who Rutledge later ordered to search Plaintiff's cell. (*Id.* at 25-26.) While searching Plaintiff's cell, Jaime confiscated Plaintiff's headphones and Buddhist altar cloth, claiming that it was "an altered handkerchief." (*Id.* at 26.) Additionally, Plaintiff claims "Officer Jaime added the baseball cap that Officer Carter confiscated [during Plaintiff's earlier conversation with Defendant Rutledge] to the cell search slip receipt." (*Id.*) Plaintiff further contends that Jaime's inclusion of the baseball cap on the cell search slip "is proof that Defendant Jaime carried out Defendant Rutledge's threat of searching Plaintiff's cell for [the] exercise of [his] free speech rights . . . ." (*Id.*)

With respect to the first element that Plaintiff must successfully plead, the purported protected speech activity that he appears to reference is the CDCR 22 grievance form he submitted to Rutledge and Plaintiff's subsequent conversation with Rutledge for failing to respond. (Doc. No. 1 at 27; Doc. No. 24 at 13-14.) "It is well-established that, among the rights they retain, prisoners have a First Amendment right to file prison grievances. Retaliation against prisoners for their exercise of this right is itself a constitutional violation, and prohibited as a matter of clearly established law." *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009); *see also Watison*, 668 F.3d at 1114. "The filing of an inmate grievance is protected conduct." *Watison*, 668 F.3d at 1114 (citation omitted); *see also Shepard v. Quillen*, 840 F.3d 686, 688 (9th Cir. 2016) ("We have long recognized that corrections officer may not retaliate against a prisoner for exercising his First Amendment right to report staff misconduct.") Plaintiff's submitting the CDCR 22 grievance to Rutledge was protected activity. Moreover, Plaintiff's subsequent follow-up conversation with Rutledge was related to the initial grievance and is thus inextricably intertwined with that initial protected conduct. Accordingly, Plaintiff has sufficiently alleged he engaged in protected conduct that was allegedly retaliated against when he gave Rutledge the CDCR 22 form and later followed-up about it.[4]

Turning to the second element, although cell searches are a routine part of prison life, *see Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984), a cell search may nonetheless constitute an adverse action, as such an action need not be an independent constitutional violation, *see Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). An otherwise permitted action can be the basis for a retaliation claim if performed with a retaliatory motive and

---

[4] Whether *Jaime* searching Plaintiff's cell *because of* that protected conduct is a separate and distinct question that that Court will address below. For now, Plaintiff sufficiently satisfies the first element *if* Jaime retaliated against him for filing the grievance against Rutledge.

11

lacking a legitimate correctional goal.  *See Watison*, 668 F.3d at 1115 (holding that an inmate had sufficiently alleged that an officer took an adverse action against him when the officer filed a disciplinary charge against that inmate which led to the inmate being placed in administrative segregation).   Here, Plaintiff alleges his cell was searched as a direct result of following up on his grievance against Rutledge.  (Doc. No. 1 at 14, ¶ 18 ("[After Plaintiff asked about the CDCR 22] Rutledge threatened [P]laintiff to search his cell and threated to take the hat he was wearing."); Watkins Decl., *id.* at 81 ("Rutledge threatened that he would go search Cejas' cell . . . ."); Roettgen Decl., *id.* at 82 ("Rutledge further stated he would tear-up Cejas' cell . . . .").)   Plaintiff also alleges that he was specifically targeted for a cell search.  (*See id.* at 26 (alleging Defendants "[o]nly searched [P]laintiff['s] cell and property area but left the other occupant in the cell inmate Shields' property untouched.").)   Because Plaintiff alleges he was targeted for an otherwise routine cell search in retaliation for engaging in protected conduct, he has sufficiently pled that "adverse action" was taken against him.

However, Plaintiff has not sufficiently pled the third element of a retaliation claim that there was a causal connection between *Defendant Jaime* searching his cell and the grievance against Rutledge.  Although the cell search occurred shortly after Plaintiff's conversation with Rutledge, Plaintiff does not allege that Jaime was present during Plaintiff's earlier conversation with Rutledge, that Rutledge apprised Jaime of the content of that conversation, or that Jaime otherwise knew about the CDCR 22 Plaintiff had submitted to Rutledge.  Unlike in *Watison*, where the officer who took the alleged adverse action had first-hand knowledge of the complaints the prisoner filed against her, there is no indication or allegation in this case that Jaime—a third party to the dispute between Plaintiff and Rutledge—ever had knowledge of the grievance or the confrontation that

14-CV-1923-WQH(WVG)

preceded the cell search.[5]  Jaime's knowledge of the grievance is, of course, critical because he could not have searched Plaintiff's cell in retaliation for—or because of—something about which he had no knowledge.  *Wood v. Yordy*, 753 F.3d 899, 904-05 (9th Cir. 2014) (affirming grant of summary judgment where no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to prior lawsuit); *Pratt*, 65 F.3d at 808 (concluding that the prisoner failed to establish a retaliation claim when no evidence that prison officials knew of the conduct giving rise to the alleged retaliatory action); *see also Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (holding that a prisoner alleging retaliation must show, *inter alia*, that a state actor took adverse action against him *because of* the prisoner's protected conduct).  Because Plaintiff does not allege that Jaime knew about the grievance—and no such reasonable inference can be drawn from the Complaint's allegations—he has failed to properly allege that Jaime took an adverse action (cell search) *because of* the protected activity (grievance against Rutledge).  Accordingly, Plaintiff has failed to satisfy the third element of a First Amendment retaliation claim against Jaime.

Fourth, notwithstanding the above discussion and assuming for the sake of argument that Plaintiff has satisfied the third element of a retaliation claim, he has sufficiently pled that Jaime's actions would chill future First Amendment activity. The inquiry here is not whether Plaintiff was actually chilled from engaging in protected activity but whether "the adverse action at issue would chill or silence *a person of ordinary firmness* from future

---

[5] Plaintiff's own witnesses do not place Jaime at the scene of Plaintiff's confrontation with Rutledge.  (*See* Complaint, Doc. No. 1 at 80-82.)  Inmate John Roettgen declares the confrontation occurred "in line at the gate for laundry" and identifies only Officer M. Carter as an officer who witnessed the confrontation and heard the subject matter of the discussion.  (*Id.* at 82.)  Inmate Chad Witkins identifies Officer M. Carter, Officer R. E. Garay, and Chief Job Steward.  (*Id.* at 80-81.)  Neither witness identifies Defendant Jaime as being present to witness the confrontation.

13

First Amendment activities." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (internal quotations and citations omitted) (emphasis added).   This is an objective standard.[6]   *Id.*   Moreover, although Plaintiff has not expressly alleged that the alleged retaliatory search of his cell has a chilling effect on inmates' filing grievances against officers, his allegations of harm may be sufficient. *Wilson v. Nesbeth*, 341 Fed. Appx. 291, 293 (9th Cir. 2009) (unpublished) ("This court has previously concluded that allegations of harm were sufficient to ground a First Amendment retaliation claim without discussing whether that harm had a chilling effect.") (citing *Pratt*, 65 F.3d at 807-08); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989)).

Here, the harm Plaintiff alleges he suffered from pursuing his CDCR 22 grievance against Rutledge was the retaliatory search of his cell and confiscation of his possessions. In light of these allegations, it is likely that an inmate of reasonable firmness in Plaintiff's position would hesitate to pursue grievances against corrections officers in general—or Rutledge and Jaime specifically—if he was faced with a possibility of a search of his cell[7] and property confiscation for doing so.   This Court is not hard-pressed to believe that an inmate at the mercy of guards' retaliatory whims would be chilled from exercising his First Amendment right to file a grievance under such circumstances. *Accord Packnett v. Wingo*, 471 Fed. Appx. 577, 578 (9th Cir. Feb. 21, 2012) (unpublished) ("Dismissal of [the] retaliation claim against defendants in their individual capacity was . . . improper because

---

[6] Because this is an objective standard, it is immaterial whether Plaintiff continued to file grievances or filed the instant lawsuit despite the possibility that he might be subject to another allegedly retaliatory cell search. *See Brodheim*, 584 F.3d at 1271 (reversing dismissal where district court focused on whether the inmate plaintiff was actually chilled); *Rhodes*, 408 F.3d at 568-69 (rejecting argument that inmate did not state a claim for relief because he had been able to file inmate grievances and a lawsuit).

[7] Which is his personal space to the extent that one can have personal space in prison.

14

[the plaintiff] alleged that his First Amendment rights were chilled when defendants searched his cell, seized his property, and otherwise retaliated against him for filing grievances."); *Percelle v. Pearson*, 2016 U.S. Dist. LEXIS 177626, at *5-6 (N.D. Cal. Dec. 21, 2016) (unpublished) (finding chilling effect possible where "a person of ordinary firmness may hesitate to pursue his case against CDCR when, shortly after obtaining an entry of default in that case, CDCR officers search his cell and open an investigation into whether he is a gang member."); *Haddix v. Burris*, 2015 U.S. Dist. LEXIS 29281, at *21-22 (N.D. Cal. Mar. 10, 2015) (unpublished) (finding retaliatory cell searches could satisfy the required chilling effect element of a First Amendment retaliation claim); *Davis v. Runnels*, 2013 U.S. Dist. LEXIS 106000, at *18-19 (E.D. Cal. July 29, 2013) (unpublished) (same).  Thus, assuming for the sake of argument that Plaintiff satisfied the third element, he has also satisfied the fourth element of his retaliation claim.

Finally, Plaintiff must allege that Jaime's search of his cell did not advance legitimate penological interests.  Indeed, prison officials have legitimate penological interests in conducting cell searches.  *See Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).  Although Plaintiff could successfully satisfy this element "by alleging, in addition to a retaliatory motive, that the defendant's actions were arbitrary and capricious . . . or that they were unnecessary to the maintenance of order in the institution," *Watison*, 668 F.2d at 1114-15, he has not made any such allegations *against Jaime*—and he cannot do so under the factual allegations as they currently stand.

While it could be inferred that *Rutledge* searching the cell or ordering the cell search was arbitrary, capricious, and served no legitimate penological purpose because it was in retaliation for Plaintiff pressing him to answer the CDCR 22, the Court cannot draw a reasonable inference that *Jaime's* searching the cell pursuant to Rutledge's order was the same.  That is because without evidence or allegations that Jaime knew about Plaintiff's grievance and that his search of the cell was ordered because Plaintiff confronted Rutledge

15

about the unanswered grievance, it is logical to conclude that from Jaime's perspective, he was simply following a lawful order to search an inmate's cell. And because cell searches generally advance legitimate penological interests, the Complaint currently alleges nothing more than Jaime engaging in an activity that advanced a legitimate penological interest. Accordingly, Plaintiff has failed to satisfy the fifth element of the retaliation claim.

Based on the foregoing, Plaintiff has not sufficiently pled that *Defendant Jaime* retaliated against him for exercising his First Amendment right to pursue a grievance against Defendant Rutledge.

**B.   Claims Against Defendant Paramo**

Plaintiff asserts that Defendant Paramo, the prison's warden, violated his First and Fourteenth Amendment rights because he was the supervisor of the Appeals Coordinators who repeatedly screened out Plaintiff's complaints. Defendants argue that Paramo must be dismissed from this suit because supervisors cannot be held liable under 42 U.S.C. § 1983.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Rather, § 1983 imposes two essential proof requirements upon a plaintiff: (1) that a person acting under color of state law committed the conduct at issue and (2) that the conduct deprived the claimant of some right protected by the Constitution of the United States. *See* 42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), overruled on other grounds by *Daniel v. Williams*, 474 U.S. 327, 330-31 (1986). Here, there appears to be no dispute that Defendants Olson and Ramirez acted under the color of state law in their official capacities as Appeals Coordinators at the Donovan Correctional Facility. Consequently, Plaintiff's federal claims are contingent upon the second inquiry—namely, whether they deprived Plaintiff "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983.

16

### 1. Plaintiff has not alleged sufficient facts to state a claim for *respondeat superior* liability against Defendant Paramo.

Plaintiff claims Paramo is liable because he "prevent[ed] Plaintiff from obtaining relief and from recovering his Buddhist pendant or Buddhist altar cloth because [P]aramo hired [A]ppeals [C]oordinator[s] R. Olson and J. Ramirez, [sic] Paramo is their boss." (Doc. No. 1 at 28.)  Essentially, Plaintiff is asserting a theory of *respondeat superior* liability against Paramo, as Plaintiff confirms in his Opposition.[8]  (Doc. No. 24 at 3-4.) Paramo does not contest that he is the supervisor of the Appeals Coordinators, and the Court will so presume for purposes of this analysis.  (Doc. No. 17 at 3-4.)

Contrary to Defendants' assertion, a defendant may be held liable in his individual capacity as a supervisor under § 1983 "'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'"  *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).  Thus, plaintiffs may hold supervisors "*individually* liable in § 1983 suits when

---

[8] In his Complaint, Plaintiff asserts that he is suing Defendant Paramo in his individual and official capacities, (Doc. No. 1 at 2), but only discusses holding Paramo liable in his individual capacity in his Opposition, (Doc. No. 24 at 3-7).  Officials can be held liable under § 1983 in both their individual and official capacities. *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991).  However, official liability "must be attributable to official policy or custom." *Id*.  Consequently, supervisors may be found liable in their official capacities if "'policy or custom' . . . played a part in the violation of federal law." *Id*.  Plaintiff asserts that Paramo "is also policy maker for RJDP [Richard J. Donovan Prison], and establishes policies or written regulations that result in violations of constitutionally established civil rights." (Doc. No. 1 at 9.)  However, Plaintiff does not pursue this argument in his Opposition and does not identify an unconstitutional policy in his Complaint or Opposition that Paramo is enforcing.  Thus, this Court only will address Plaintiff's contentions that Paramo is *individually* liable under a theory of *respondeat superior*.

17

culpable action, or inaction, is directly attributed to them.  [The Ninth Circuit] ha[s] never required a plaintiff to allege that a supervisor was physically present when the injury occurred."  *Id*. at 1205 (emphasis added).  Supervisors do not need to be "directly and personally involved in the same way as are the individual officers who are on the scene inflicting the constitutional injury."  *Id*. (quoting *Larez*, 946 F.2d at 645).  Supervisors may be held liable for their "own culpable action or inaction in the training, supervision, or control of his subordinates," "his acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others."  *Id*. at 1205-06 (quoting *Larez*, 946 F.2d at 646).

A prisoner must show that the supervisor's breach of a duty to the prisoner was the proximate cause of the prisoner's injury.  *Id*. at 1207.  The Ninth Circuit has held that "acquiescence or culpable indifference" may sufficiently evidence a supervisor's personal role in the alleged violations.  *Id*. at 1208 (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005)).  Alternatively, if the supervisor (1) "set[s] in motion a series of acts by others" or (2) "knowingly refuse[s] to terminate a series of acts by others" that the supervisor "knew or reasonably should have known would cause others to inflict a constitutional injury," then a plaintiff has established the requisite causal connection.  *Id*. at 1207-08 (quoting *Dubner v. City and Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)).

Here, Plaintiff's chief contention is that Defendant Paramo is individually liable in his capacity as supervisor because he is the "boss" of the Appeals Coordinators who improperly screened out Plaintiff's various complaints.  (Doc. No. 1 at 28.)  Specifically, "Defendant Paramo set in motion a series of acts by others, [and] knowingly refused to terminate the series of acts by others."  (Doc. No. 24 at 3.)  Plaintiff alleges that Paramo "personally participated in the deprivation of the First Amendment denial to [sic] access the courts when he failed to act by reviewing the Plaintiff's staff misconduct/citizen

complaints of Defendants R. Olson and J. Ramirez." (Doc. No. 24 at 5.) Further, Plaintiff alleges that Paramo "knowingly" refused to intervene to prevent Defendants Olson and Ramirez from violating Plaintiff's First Amendment right of access to the courts, which prevented Plaintiff from "pursu[ing] the necessary sequence of appeals, and exhaust[ing] administrative remedies." (*Id.*)

Reasonably construing the above allegations, Plaintiff's claim against Defendant Paramo is dependent upon Defendants Olson and Ramirez violating his First Amendment rights by denying him access to the courts. Thus, the Court must determine whether Plaintiff has alleged an underlying constitutional violation by Olson and Ramirez such that Paramo's culpable failure to intervene would be grounds to hold him liable in his role as their supervisor.

### a. Plaintiff has not alleged sufficient facts to state a claim for violation of his First Amendment right of access to the courts.

Prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). Inmates alleging violations of their right of access to the courts must show actual injury. *Lewis v. Casey*, 518 U.S. 343, 351-52 (1996); *Keenan v. Hall*, 83 F.3d 1083, 1094 (9th Cir. 1996) ("[T]o state an access to the courts claim that concerns neither the inadequacies of the law library nor the lack of assistance of a person trained in law, an inmate must demonstrate 'actual injury.'"); *see, e.g.*, *Hebbe v. Pliler*, 627 F.3d 338, 342-43 (9th Cir. 2010) (holding that prisoner had stated claim for denial of access to the court where he alleged that he was denied access to the prison's law library during thirty-day lockdown, causing him to miss court deadline). The loss or rejection of a claim is an example of an actual injury. *Lewis*, 518 U.S. at 351.

The right of access to the courts is satisfied where the state enables the prisoner to "bring[] contemplated challenges to sentences or conditions of confinement before the courts." *Id.* at 356. In fact, "[i]nvocation of the judicial process indicates that the prison

has not infringed [the prisoner's] First Amendment right to petition the government for a redress of grievances." *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996).  Further, "the district court assumes that a prisoner's claims have been exhausted when his grievances were not processed within prescribed time limits." *Mahogany v. Miller*, 252 Fed. Appx. 593, 594 (5th Cir. Oct. 24, 2007) (unpublished); *see also Abreu v. Ramirez*, 284 F. Supp. 2d 1250, 1258-59 (C.D. Cal. 2003) ("Plaintiff's allegations that prison officials refused to answer his grievances are not enough, by themselves, to sustain a claim of denial of access to the courts."); *Riley v. Roach*, 572 Fed. Appx. 504, 507 (9th Cir. May 9, 2014) (unpublished) ("'[W]hen the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance.'") (quoting *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991).

Here, Plaintiff has not alleged that any of the Defendants interfered with his ability to file the instant suit.  He only has alleged that Defendants Olson and Ramirez interfered with his use of the internal prison grievance procedures, which impaired his ability to exhaust administrative remedies.  However, such impairment does not constitute an actual injury because Defendants' alleged interference did not prevent Plaintiff from bringing this suit.   Further, had Defendants challenged Plaintiff's suit for failure to exhaust administrative remedies, Defendants' alleged failure to process his internal grievances in a timely manner likely would have led the Court to conclude that Plaintiff effectively had exhausted his administrative remedies.  Thus, even construing the facts in the light most favorable to Plaintiff, he has not alleged any facts indicating that he actually has been injured by Defendants Olson's and Ramirez's alleged failure to process his internal grievances and, thus, has not stated a First Amendment claim for denial of access to the courts.

Related to the First Amendment claim is the Fourteenth Amendment denial of due process claim.  To state a claim for denial of due process under the Fourteenth Amendment, a prisoner must demonstrate that the defendant's alleged violation deprived him of a life, liberty, or property interest.  *See Mendoza v. Blodgett*, 960 F.2d 1425, 1428 (9th Cir. 1992); *Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015).  "[A] liberty interest may arise from either of two sources: the due process clause or state law."  *Mendoza*, 960 F.2d at 1428.  An individual must have "a legitimate claim of entitlement" to a liberty interest for it to be a protectable right.  *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 7 (1979).

Prisoners do not have a "legitimate claim of entitlement to a grievance procedure." *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *see also Bingham v. Thomas*, 654 F.3d 1171, 1177 (11th Cir. 2011) ("[A]n inmate has no constitutionally-protected liberty interest in access to [a prison's grievance] procedure."); *Ouzts v. Cummins*, 825 F.2d 1276, 1278 (8th Cir. 1987) ("Prison officials' failure to respond to a grievance is not actionable under § 1983.").  Thus, even if Plaintiff had alleged a violation of his right to procedural due process under the Fourteenth Amendment, he still would not have stated a claim against Paramo on the ground that Olson and Ramirez failed to comply with the prison's grievance procedures.  No such liberty interest exists.

### 2. Conclusion

Returning to Plaintiff's *respondeat superior* claim against Defendant Paramo, as discussed above, Plaintiff has not alleged the "underlying constitutional violation" required to state a claim for supervisory liability under § 1983.  Because Plaintiff fails to state a claim against Olson and Ramirez, it follows, *a fortiori*, that he cannot pursue this action against Defendant Paramo under a *respondeat superior* theory of liability.  There simply is no underlying constitutional violation for which Paramo can be liable as a supervisor.

## V.   CONCLUSION

For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Dismiss be GRANTED as to the Plaintiff's claims for *respondeat superior* against Defendant Paramo and for retaliation against Defendant Jaime.   This Report and Recommendation will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(1988) and Federal Rule of Civil Procedure 72(b).

IT IS ORDERED that no later than **May 5, 2017**, any party to this action may file written objections with the Court and serve a copy on all parties.   The document shall be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and served on all parties no later than **May 19, 2017**.   The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.   *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

DATED:  March 28, 2017

_____
Hon. William V. Gallo
United States Magistrate Judge

14-CV-1923-WQH(WVG)